IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EDWARD SLAVIN, | ) |
| Plaintiff, | ) ) ) ) |
| vs. | ) Case No. 20 C 1180 ) |
| QUENTIN TANNER, Dietary Supervisor, and CHARLES TRUITT, Warden of Stateville Correctional Center, | ) ) ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Edward Slavin, who is imprisoned in the Illinois Department of Corrections, alleges that prison officials refused to provide him with an adequate kosher diet during the approximately five years that he was housed at Stateville Correctional Center. He sued Quentin Tanner, the former food service manager of Stateville, and Charles Truitt,[1] the warden of Stateville, for violating his constitutional right to practice his Jewish faith under 42 U.S.C § 1983 (claim against Tanner) and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc (claim against the warden). The defendants have moved for summary judgment on all claims. For the reasons

---

[1] Slavin's complaint and the parties' filings name Randy Pfister, the former warden of Stateville, as a defendant. Because Slavin has sued Pfister only in his official capacity, the Court has substituted the current warden of Stateville, Charles Truitt, as the proper defendant. See Fed. R. Civ. P. 25(d).

below, the Court grants summary judgment for the defendants on the RLUIPA claim but denies the defendants' motion on the section 1983 claim.

## Background

The following facts are undisputed unless otherwise noted. Slavin, who is Jewish, requested and was approved to receive a kosher diet while he was incarcerated at Stateville from September 2017 until September 2022. During that time period, defendant Quentin Tanner was employed at Stateville as the "Food Service (Dietary) Manager." Defs.' Stmt. of Material Facts ¶ 4. As food service manager, Tanner was responsible for planning and ordering food service items—including meals for those on special diets—via a form provided by the IDOC procurement office. He was also responsible for training the Stateville kitchen staff in proper food preparation and sanitation. There is no universal definition of "kosher," but the parties agree that kosher rules generally involve both avoiding the consumption of certain food (such as pork) and ensuring that kosher foods are not contaminated by non-kosher foods by, for example, using the same pots to cook prohibited and permissible foods.

For lunch and dinner, Stateville gave Slavin pre-packaged, double-sealed meal trays that were purchased from a certified kosher vendor. The kosher trays included a protein, starch, and vegetables. The parties agree that these pre-packaged trays were in fact kosher, but Slavin alleges that the portions were too small to meet the dietary requirements of an adult male. In addition to the pre-packaged trays, Tanner offered Slavin sealed peanut butter and jelly packets and sealed packets of crackers, juice, and soy milk. The parties agree that these extra items were kosher. Tanner also offered lettuce and canned fruit, but the parties dispute whether those items were kosher.

2

Stateville did not provide pre-packaged meal trays for breakfast for those on the kosher diet. According to the defendants, the IDOC order form did not provide Tanner with the option of purchasing pre-packaged meal trays for breakfast. Instead, breakfast for those on the kosher diet was prepared in Stateville's kitchen. The parties dispute whether the breakfast served to Slavin was in fact kosher. The defendants contend that, although they did not serve pre-packaged kosher breakfast trays, they "engage[d] in best practices to keep the breakfasts, which usually include[d] some variety of cereal, milk, hard-boiled eggs, and bread, kosher." Defs.' Mem. in Supp. of Summ. J. at 6. These practices included "using separate cooking utensils, a separate pot, and a separate kosher-only skillet to warm kosher foods" and "us[ing] disposable cups and utensils to dispense and serve kosher food so as not to alter its integrity by touching it with utensils or containers used for non-kosher food." *Id.* at 7. In general, Tanner asserts that he "train[ed] his staff on the importance of sticking to kosher principles as closely as they can." Defs.' Stmt. of Material Facts ¶ 26. Slavin, in contrast, says that he was served a "regular prison population breakfast" and that kitchen staff did not receive any training regarding kosher best practices or take any measures to prevent cross-contamination between kosher and non-kosher foods. Pl.'s Resp. at 11. Slavin also provided affidavits from inmate kitchen staff who stated that they had never received any special instructions regarding how to handle kosher food.

While at Stateville, Slavin submitted two grievances regarding the prison's kosher offerings. In the grievances, Slavin explained his view that "only the sealed black tray" provided for lunch and dinner, as well as the sealed peanut butter and jelly and crackers, were kosher. Am. Compl. at A15–16 (Ex. F). He specifically complained that

3

"breakfast is totally contaminated, thusly I'm left with 2 black sealed trays for my complete diet." *Id.* at A16. He requested "authentic kosher food for all 3 meals." *Id.* at A15. In February 2019, the grievances were denied. As justification for the denial, the grievance officer's report stated that "per Dietary Manager Q. Tanner, Kosher meals are provided for offenders that have been approved for same through the Chaplaincy Dept." and that Slavin "failed to provide the specific dates and the food items he received that he claims were not kosher." *Id.* at A19.

In February 2020, Slavin, acting *pro se*, filed this suit against the defendants for violating his free exercise rights. The Court screened Slavin's complaint under 28 U.S.C. § 1915A and permitted Slavin to proceed on a claim for damages against Tanner in his individual capacity under 42 U.S.C. § 1983 and on a claim for injunctive relief against warden Truitt in his official capacity under RLUIPA. The defendants moved for summary judgment on the ground that Slavin had failed to exhaust administrative remedies as required under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). The Court denied that motion and, after an evidentiary hearing, overruled the exhaustion defense on the merits. In September 2022, Slavin was transferred from Stateville to Dixon Correctional Center. The defendants' second motion for summary judgment is now before the Court.

## Discussion

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "construe all facts and inferences in favor of the nonmoving party." *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015).

4

A.     **RLUIPA claim**

"RLUIPA prohibits a 'government' from 'impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution,' unless the 'imposition of the burden on that person' is (1) 'in furtherance of a compelling governmental interest' and (2) 'the least restrictive means of furthering that compelling governmental interest.'" *Walker v. Baldwin*, 74 F.4th 878, 880–81 (7th Cir. 2023) (quoting 42 U.S.C. § 2000cc-1). RLUIPA does not authorize money damages against prison officials in their individual capacities, and sovereign immunity bars claims for damages against state officials in their official capacities. *See id.* at 881 & n.1. The Court allowed Slavin to proceed against Truitt, the warden at Stateville. Truitt argues that he is entitled to summary judgment because Slavin is no longer housed at Stateville and therefore any request for injunctive relief regarding Stateville's kosher offerings is moot.

The transfer of an imprisoned person to a different prison can render moot his claim for injunctive relief. *See, e.g.*, *Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011) (holding that a plaintiff's RLUIPA claim was moot after his transfer to a different prison because he did not show "a realistic possibility that he will again be incarcerated in the same state facility and therefore be subject to the actions of which he complains here"); *Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009) (same with respect to a transferred inmate's First Amendment claim). Truitt characterizes Slavin's transfer to Dixon as permanent, and Slavin does not dispute that description. In addition, Slavin's allegations and evidence exclusively concern the conditions at Stateville; he has not complained about the kosher offerings at Dixon. Because injunctive relief against Truitt

would no longer remedy any ongoing violation of Slavin's rights, his RLUIPA claim is moot.

**B.      First Amendment claim**

Slavin claims that Tanner violated the free exercise clause of the First Amendment by denying him an adequate kosher diet.  Slavin's section 1983 claim is not moot because he has requested monetary damages.  *See Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 596 (7th Cir. 2006).  Prison officials violate the free exercise clause of the First Amendment if they "personally and unjustifiably place[ ] a substantial burden on [an imprisoned person's] religious practices."  *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016).  A burden is substantial if it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Id.*  (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 717–18 (1981)).  "A burden is unjustified if it is not reasonably related to a legitimate penological interest."  *Id.* at 380.

**1.      Sincerity of Slavin's religious belief**

Tanner first "challenge[s] the sincerity of [Slavin's] claim that keeping kosher is important to his personal religious practice."  Defs.' Mem. in Supp. of Summ. J. at 5.  He points to commissary records showing that Slavin made multiple non-kosher food purchases and to Slavin's testimony that he sometimes eats non-kosher foods offered to him by others.  But Slavin provides two plausible explanations for the apparent incongruence.  First, he says that he uses non-kosher commissary foods to barter with others.  Second, he explains that he only eats non-kosher foods because there are "tempting foods all over the cellhouse and he gets really hungry.  It's extremely depressing.  Guys will cook and say 'Hey Jew – come break bread.' . . . It takes a lot of

6

special navigation around these men. This is real 'Max' prison life not a T/V show." Pl.'s Resp. at 11. A reasonable jury would be entitled to credit Slavin's side of the story. The fact that an imprisoned person who is chronically underfed on a prison's kosher meal plan occasionally gives into temptation or social pressure to consume non-kosher food does not necessarily mean that his belief in the importance of keeping kosher is not sincerely held.

### 2. Substantial burden

Slavin advances two main theories regarding how Tanner substantially burdened his ability to keep kosher. First, he contends that Tanner failed to provide him with a nutritionally adequate kosher diet. Second, he contends that Tanner ordered the same four or five kosher meal trays for lunch and dinner, often repeating the same tray for days on end.

#### a. Nutritional adequacy of kosher diet

The Seventh Circuit "ha[s] repeatedly held that forcing an inmate to choose between daily nutrition and religious practice is a substantial burden." *Thompson*, 809 F.3d at 380. Therefore, at the summary judgment stage, Slavin need only provide evidence from which a reasonable jury could conclude that Tanner regularly failed to provide him with a nutritionally adequate kosher diet. Slavin argues that the kosher diet at Stateville was nutritionally deficient because (1) there was no kosher breakfast, (2) the pre-packaged kosher meal trays did not provide sufficient calories and nutrients for an adult male, (3) other foods offered to him, such as salad and fruit, were not kosher.

These factual issues are genuinely disputed. The parties dispute whether the breakfast meal and other food that is prepared in Stateville's kitchen is in fact kosher.

7

Tanner contends that, although Stateville does not serve pre-packaged kosher breakfast trays, the kitchen staff "engage in best practices to keep the breakfasts, which usually include some variety of cereal, milk, hard-boiled eggs, and bread, kosher." Defs.' Mem. in Supp. of Summ. J. at 6. These practices include "using separate cooking utensils, a separate pot, and a separate kosher-only skillet to warm kosher foods" and "us[ing] disposable cups and utensils to dispense and serve kosher food so as not to alter its integrity by touching it with utensils or containers used for non-kosher food." Id. at 7. Slavin, in contrast, says that he was served a "regular prison population breakfast" and that Tanner and the kitchen staff did not take any measures to prevent cross-contamination between kosher and non-kosher foods. Pl.'s Resp. at 11. Two workers on the breakfast shift in Stateville's kitchen submitted affidavits in which they stated that "supervisors never informed us of any special requirements for kosher meals," that breakfast items "were all cooked in regular pans," that "[t]here was no kosher pans," that "there was no separation," and that "everything" was washed in the same sink. Pl.'s Resp. at 288–89 (Ex. 22). In addition, two imprisoned men who worked the lunch and dinner shifts submitted affidavits stating that they did not receive any special instructions regarding how to handle food given to people on the kosher diet. Id. at 286–87.

      Tanner cites the deposition testimony of James Keller, IDOC's food services administrator, to argue that a registered dietician determined that the kosher diet at Stateville was "nutritionally at or above the required nutritional needs for an adult male." Defs.' Stmt. of Material Facts ¶ 19. But in the testimony that Tanner cites, Keller stated only that he believed that, some time prior to August 2017, a registered dietician had

determined that "[t]he kosher meals as they are with the supplemental items that we add to them either meet or exceed the nutritional adequacies as established by the agency." Defs.' Stmt. of Material Facts, Ex. 5, at 96:1–96:11, 101:3–101:7.

This is insufficient to eliminate a genuine factual dispute regarding the nutritional adequacy of the kosher diet served to Slavin between September 2017 and September 2022. As discussed, the parties dispute whether some of the food items Tanner served to Slavin alongside the kosher lunch and dinner trays were in fact kosher. Moreover, Tanner does not suggest that Slavin's daily nutritional requirements could be met by the kosher lunch and dinner trays alone—i.e., without breakfast. Finally, Tanner testified during his deposition that he had never personally reviewed the nutritional information of the pre-packaged meal trays. Although he stated that he believed they met the recommended daily allowance of calories, he also stated that, in his opinion, the trays "would not be adequate to feed a grown man." Tanner Dep. at 121:8–123:24. In sum, there is a genuine factual dispute regarding whether Tanner took measures to ensure that breakfast and other food prepared in Stateville's kitchen was kosher, and thus a reasonable jury could conclude that Slavin was forced to "choose between daily nutrition and religious practice." *Thompson*, 809 F.3d at 380.

        b.        **Repetitiveness of kosher diet**

Slavin also contends that Tanner substantially burdened his religious practice by repeatedly serving him the same five meals for lunch and dinner over the span of roughly five years. Often, he says, he was given the same meal for lunch and dinner for days on end. Slavin does not contend that meal variety is itself a requirement of kosher law. Rather, he says that the endless repetition caused "meal fatigue" which made it

9

exceedingly difficult to stick to his religious beliefs. The question is whether the lack of variety in the kosher lunch and dinner offerings put "substantial pressure" on Slavin "to modify his behavior and to violate his beliefs." *Id.* at 380. Slavin contends, and Tanner does not dispute, that he was served only five different meals for lunch and dinner, often with the same meal served twice a day or for days in a row. In comparison, Slavin argues that those who were not on a special diet enjoyed a rotation of 23 lunch meals and 18 dinner meals. Further, the five-item kosher menu did not repeat only for a matter of weeks or months—Slavin says, and Tanner has not disputed, that the same five meals were served over the course of five years. In sum, Slavin has provided sufficient evidence to permit a reasonable jury to find that the meal repetition "ha[d] a serious effect, and the record is not so lopsided as to permit that contention's rejection on summary judgment." *Schlemm v. Wall*, 784 F.3d 362, 365 (7th Cir. 2015) (holding that a prison's denial of an imprisoned person's request to obtain "game meat" for a religious feast could constitute a "substantial burden" under RLUIPA).[2]

### 3. Legitimate penological justification

Even if a prison official imposes a substantial burden on an imprisoned person's religious practice, the official does not violate the First Amendment if the burden is "reasonably related to a legitimate penological interest." *Thompson*, 809 F.3d at 380.

---

[2] The "substantial burden" standard is the same for both RLUIPA claims and constitutional free exercise claims in the prison context. *Compare*, *e.g.*, *Thompson*, 809 F.3d at 379 (substantial burden under the free exercise clause "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs" (internal quotations omitted)) *with West v. Radtke*, 48 F.4th 836, 845 (7th Cir. 2022) (substantial burden under RLUIPA "arises when the government put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs" (internal quotations omitted)).

Tanner's motion for summary judgment focuses exclusively on claimed legitimate penological justifications for declining to build a completely separate kosher kitchen (namely, the cost). But even if the Court were to accept the justification for failing to build a kosher kitchen, Tanner would not be entitled to summary judgment. To prevail on this basis, Tanner must provide a legitimate penological justification for failing to provide Slavin with a nutritionally adequate and sufficiently varied kosher diet, not simply a legitimate penological justification for failing to address Slavin's most drastic demands. *See Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1004 (7th Cir. 2019) ("[P]rison officials cannot rely on the mere incantation of a penal interest but must come forward with record evidence that substantiates that the interest is truly at risk and that prison officials have chosen an appropriate manner to assert that interest.").

Tanner contends that Slavin has "mov[ed] the goalposts" at the summary judgment stage by shifting focus away from his demand that Stateville build a separate kosher kitchen and toward more moderate accommodations. Defs.' Reply at 8. The Court disagrees. Tanner himself has argued that Slavin's religious exercise was not burdened because he took adequate measures to prevent cross-contamination of kosher food in the Stateville kitchen, such as "train[ing] his staff on the importance of sticking to kosher principles as closely as they can" by "mak[ing] every effort to keep *all* food provided to the kosher inmates kosher by using separate utensils, a separate pot, and separate kosher-only skillet to warm kosher foods." Defs.' Stmt. of Material Facts ¶ 26; Defs.' Mem. in Supp. of Summ. J. at 6–7. He has never suggested that the very measures that he claims to have implemented are in fact burdensome or unreasonable. Nor does Tanner's motion for summary judgment suggest any justification for the

11

prolonged menu repetition. Therefore, Tanner is not entitled to summary judgment on this basis.

### 4. Personal involvement

Tanner also argues that there is no evidence that he was "personally involved in any unconstitutional conduct." Defs.' Reply at 15. To prevail on section 1983 claim, a plaintiff must establish that the defendant "caused or participated in [the] constitutional deprivation." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). "An official satisfies the personal responsibility requirement of § 1983 if she acts *or fails to act* with deliberate or reckless disregard of the plaintiff's constitutional rights." *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) (emphasis in original); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 395–396 (2015) (explaining in the context of a section 1983 due process claim that "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process" and that therefore "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind") (emphasis in original). If the evidence showed that the inadequacies in the kosher diet at Stateville resulted from inattention or sloppiness by kitchen workers, Tanner might have a valid point. But Slavin has identified evidence that there were systemic deficiencies in Stateville's kosher offerings, such as a complete failure to implement any guidelines for separating kosher and non-kosher foods and utensils. Tanner has stated that he was responsible for planning and ordering kosher meals and for training kitchen staff to handle food and kitchen tools for those on kosher diets. If, as Slavin contends, Tanner knowingly or recklessly failed to carry out these responsibilities, a reasonable jury could find that he personally participated in the constitutional violations.

### 5. Qualified Immunity

Finally, Tanner asserts that qualified immunity entitles him to summary judgment on Slavin's free exercise claim. Prison officials "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 538 U.S. 48, 62–63 (2018) (internal quotations omitted). Tanner argues that both parts of the qualified immunity inquiry cut in his favor: (1) Slavin's allegations do not rise to the level of a constitutional violation and (2) there is no clearly established right to a fully kosher kitchen in a prison.

As discussed above, Slavin has put forth sufficient evidence from which a reasonable jury could conclude that Tanner violated his free exercise rights. Therefore, the only remaining question is whether the unlawfulness of the challenged conduct was clearly established at the time of the alleged violations. "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* (internal quotations omitted). In deciding whether a right was clearly established, a court must determine whether "a legal principle . . . ha[d] a sufficiently clear foundation in then-existing precedent" and whether that settled legal principle "clearly prohibit[ed] the officer's conduct in the particular circumstances before him." *Id.* Applying this standard, the Court concludes that Tanner is not entitled to qualified immunity on Slavin's nutritional deficiency theory of liability, but that Tanner is entitled to qualified immunity on Slavin's meal repetition theory.

### a. Nutritional deficiency theory

The Seventh Circuit has held that "a prisoner has a 'clearly established . . . right to a diet consistent with his . . . religious scruples." *Thompson*, 809 F.3d at 381 (quoting *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003)). In *Thompson v. Holm*, the Seventh Circuit rejected a qualified immunity defense offered by prison officials who denied an imprisoned person pre-sunrise and post-sunset "meal bags" for two days during Ramadan because the officials' actions "forced [the plaintiff] to choose between foregoing adequate nutrition or violating a central tenant of his religion." *Id.* at 380–81. In several cases dating back over several decades, the Seventh Circuit has emphasized that prisons may not "force[ ] a prisoner to choose between adequate nutrition and religious practice" without adequate justification. *Jones v. Carter*, 915 F.3d 1147, 1150 (7th Cir. 2019); *accord Thompson*, 809 F.3d at 380 ("We have repeatedly held that forcing an inmate to choose between daily nutrition and religious practice is a substantial burden."); *Nelson v. Miller*, 570 F.3d 868, 879 (7th Cir. 2009) (same); *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990) (explaining that a prison cannot force "an improper choice between adequate nutrition and observance of the tenets of his faith" without sufficient justification); *see also Schlemm*, 784 F.3d 362, (holding that "denying access to 'traditional foods' for a religious celebration imposes a substantial burden on religion"). The right, therefore, is clearly established.

As discussed, there is a genuine factual dispute regarding what steps, if any, Tanner took to ensure that Slavin received a nutritionally adequate kosher diet. Viewing the evidence in the light most favorable to Slavin, a jury could find that Tanner took virtually no action to ensure that Slavin received a kosher breakfast and he therefore

14

knowingly placed Slavin in a position where he had to "choose between daily nutrition and religious practice" without justification. *Thompson*, 809 F.3d at 380. In sum, Slavin alleges a straightforward violation of his clearly established right to a nutritionally adequate diet consistent with his religious beliefs. Tanner is not entitled to qualified immunity on this theory of liability.

### b. Meal repetition theory

Slavin's meal fatigue theory, in contrast, is more novel. The Seventh Circuit has not yet addressed whether, in addition to ensuring that a religious diet is nutritionally adequate, prisons must also ensure that there is sufficient variety in their dietary offerings so that they remain minimally appetizing. The handful of circuits that have considered religious liberty claims premised on meal fatigue allegations have rejected the theory, albeit in nonprecedential decisions. *See Pleasant-Bey v. Tenn. Dep't of Corr.*, No. 18-5424, 2019 WL 11880267, at *3 (6th Cir. Apr. 4, 2019) (holding that an imprisoned person "failed to demonstrate a substantial burden on the exercise of his Muslim religion" based on his allegations about "the lack of variety in the food available on the halal menu"); *Tapp v. Proto*, 404 F. App'x 563, 565–66 (3d Cir. 2010) (finding no free exercise violation based on a plaintiff's allegations that "the Kosher meals the prison served him lacked variety and were often cold"); *Leonard v. Murray*, 843 F.2d 1387, 1387 (4th Cir. 1988) ("Even though the kosher menus do appear to be more repetitive than those prepared for the general population, this lack of variety does not impermissibly impede the inmates' practice of their religion."). Thus, although it was clearly established that Slavin had a right to a nutritionally adequate kosher diet absent some legitimate penological justification, it would not have been clear to a reasonable

official in Tanner's position that this "legal principle clearly prohibit[ed] [Tanner's] conduct in the particular circumstances before him,"—i.e., repeatedly serving the same five meals to Slavin. *Wesby*, 583 U.S. at 63. Tanner is entitled to qualified immunity with respect to Slavin's meal repetition theory of liability.

## Conclusion

For the foregoing reasons, the Court grants summary judgment in favor of the defendants on Slavin's claim under the RLUIPA but denies the defendants' motion for summary judgment [dkt. no. 199] on Slavin's section 1983 claim. The case is set for a telephonic status hearing on October 4, 2023 at 8:45 a.m. to set a trial date and discuss the possibility of settlement. The following call-in number will be used: 888-684-8852, access code 746-1053. The defendants' counsel is directed to make arrangements for the plaintiff to participate by telephone.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 5, 2023